Good morning, Your Honors. May it please the Court, Derek Shaffer from the Stanford Constitutional Law Center, appearing on behalf of Plaintiff Appellant Mr. Gronquist. With the Court's permission, I'd endeavor to reserve 5 minutes of our time for rebuttal. Your Honors, this is not a run-of-the-mill prisoner appeal. Mr. Gronquist's complaint, over the course of some 25 pages and 140 paragraphs – pardon me – meticulously chronicles a concerted, multifaceted campaign on the part of Washington prison officials to stymie an inmate's invocation and vindication of his constitutional rights. Yet the district court dismissed the bulk of Mr. Gronquist's legal theories at the threshold, on the premise that they did not, under any conceivable set of facts, Your Honors, amount to valid claims on which relief might possibly be granted. To now affirm the district court would, we respectfully submit, profoundly break from this Court's precedents and drastically curtail inmate's civil rights. There are several distinctive claims at issue, Your Honors, and absent contrary instruction from the Court, I propose to address each in the order set out in our briefs. And let's begin, then, with Mr. Gronquist's claim that his First Amendment rights, or exercise of his First Amendment rights, were retaliated against by defendants because of his communications with other inmates. Sotomayor, let's start there with what are his rights, First Amendment rights. Judge Schroeder, we believe he has a First Amendment right to communicate with fellow inmates. That's well established. It's what we believe the Supreme Court said in Chauvie-Murphy. It's the same overarching First Amendment right, no greater, no lesser, no different First Amendment right that exists in this context. And we believe this Court held the same thing in the Hargis case. In the context of an inmate's exchange with a prison guard about shaving and difficulties that were encountered, this Court heeded the Supreme Court's instruction in Chauvie-Murphy. In Chauvie-Murphy, the Supreme Court remanded for application of the Turner test to an inmate's legal communications with other inmates, just as the Turner test would be applied to other such communications. And that's the approach that this Court adopted in Hargis, which we believe is the right approach to follow, and we think our friends from the government largely agree with us in their answering brief on that point. And to the extent that's correct, Your Honors, this seems like a clean and easy point on which to reverse the district court. The district court simply misread the Supreme Court's decision in Chauvie-Murphy as saying that no, zero First Amendment rights could attach. Well, his right is no greater than he has no pre- he has no right to have a First Amendment-protected right to give legal advice as opposed to anything else. I agree with that, Judge Shorter. No special right as to that. If I could just take an example. Let's suppose, for instance, that Mr. Gronkow has provided a copy of the United States Constitution to a fellow inmate, or quoted the First Amendment to a fellow inmate, or talked through with a fellow inmate an occurrence that was the basis for that inmate's legal complaint. The mere fact that that's somehow legal in nature, it would shock us, Your Honors, if that meant that there's no First Amendment right that attaches, and the prison could retaliate against that speech simply because it somehow disenfranchises it. So it's greater than if they're talking about dirty movies or dirty pictures or anything else? Except to the extent that that might be unprotected or lesser-protected speech, to the extent it's obscenity or something like that. No, I'm not suggesting it's obscenity, but just anything. So if the – so that means what does the – if something is done to the person as a result of what he is communicating, then what does the State have to show? That it has a legitimate penological interest, under the classic four factors of Turner that are well-established and well-understood. And the district court needs to conduct an analysis under those four factors, which did not occur here. And we – and beyond that, Mr. Gronkow has specifically alleged in his complaint that there was no legitimate penological interest here, and that the core rationale for the prison sanctioning him was that he had exchanged knowledge with another inmate. That's specifically set out in Mr. Gronkow's complaint. There's no refutation, of course, because the district court dismissed that, those allegations on their face at the screening stage. And we believe, Your Honors, that if that rationale by itself, the fact that there was an exchange of knowledge here, suffices to justify sanctions by the prison, then there will be nothing left of the First Amendment. No meaningful communicative exchange could transpire in prisons that is not subject – that is not subject to the – that would be subject to the First Amendment and to the analysis under Turner that's meant to preserve some measure of constitutional rights in prisons, albeit with due deference to prison authorities. Our only submission here is that this case needs to go further, and that there needs to be some meaningful analysis under Turner of legitimate penological interest that has not yet transpired below, simply because we believe the district court misread Shabby Murphy. Well, we're – from an analytical standpoint, we're one step removed from that because this is a retaliation case. Indeed, it is, Judge Lee. And what – we don't have to get into so much of what his rights are to communicate. The fact is that he communicated. Clearly correct. And as far as we know, whatever he did by way of communicating is not prohibited. It's the accomplished fact. And apparently he did it in a way that didn't violate any rule. I take it. That's – we don't – I can't speak to that with authority because all we have is the complaint. And so the issue for us, as I see it, is can they retaliate for whatever he did? And we believe, Judge Levy, it comes down to the question whether there was a legitimate penological interest for sanctioning Mr. Gronquist for imposing punishment upon him. But it's a rather narrow focus that I'm trying to articulate. And you're correct, Judge Levy. We do concede it's not – you're right, it's one step removed. It's beyond the question of what his underlying First Amendment rights were. It's about whether they were retaliating unconstitutionally against him. We know what he was doing, don't we? We do know that in a good number of instances, Judge Schroeder, he's assisting other inmates with their legal arguments and their legal claims. In this instance, if I could point out, as far as his assistance of a second inmate, Mr. McReynolds, the prison actually agreed that these were not Mr. McReynolds' legal pleadings. They were simply communicative materials that Mr. Gronquist had in his own cell, which is why, according to the complaint, the prison ultimately resorted to the rationale that there was just an exchange of knowledge, inherently valuable knowledge transpiring here, which was itself something that the prison would not tolerate. And that's why we believe this is such a sweeping rationale, if it's accepted as necessarily adequate. Well, let's just suppose that the prison says, we don't like to – we have a penological – legitimate penological interest in not having prisoners encourage other prisoners to file lots and lots of grievances against our guards and our – the people who are charged with the responsibility of running this institution. Now, is that a legitimate penological interest? Well, Judge Roder, I think the devil's in the details of that. I think it really does depend on the facts. I would be surprised if the prison could simply say, recitation of the Constitution or of the First Amendment, because it might somehow assist another inmate. Kagan, you're hooking up false complaints against our prison guards or whatever. Well, and I would think that if there is a neutral policy of that sort that the prison has articulated and is enforcing in an evenhanded way, it's not just that this is a particularly meritorious lawsuit, it's not just that this is pointing to misconduct on the part of some prison officials that we don't want you coming after. If it's neutral in the sense that the Supreme Court contemplated a particular prison policy would need to be neutral and in pursuit of a legitimate penological interest, and it passes muster under the remaining factors, including the possibility that there may be other alternatives here, the impact on other guards and other inmates, and whether there's some alternative means of exercise available. If it passes muster under those – in those respects, as it usually would, Judge Schroeder, then surely the prison is entitled to enforce that in an evenhanded way, and our respectful submission is we just don't know enough on the face of this complaint to know that, and this Court has been clear in the Hargis case, and we believe the Supreme Court was clear in Chauvy-Murphy, in saying that further inquiry is indeed required in order to make sure that there's something left of the First Amendment in our prison.  Kagan. What does the record show that the State did here? Well, Your Honor, all we have in this regard is the complaint itself, as far as I'm familiar with. I'll leave it to her. It was never served? I'm sorry? It was not served? It was served as far as one persisting retaliation theory, retaliation for Mr. Gronquist's own communications on his own behalf, his efforts to prepare his own lawsuit, but not in this respect. Indeed, the prison's answer, if you look at it, said it was not answering these paragraphs of the complaint because they'd simply been screened out in toto. So we don't have much of a record on it, Judge Schroeder, and we don't even have responsible readings on it. I'm sorry, I don't know. It was dismissed. It was dismissed at the screening phase under the Prison Litigation Reform Act by the district court. Okay. If there are no further questions on the First Amendment theory, I would proceed on to the grievance process. Let me ask you another question. If you were to win here, you're from Stanford? Yes, well, Stanford Constitutional Law Center, yes. Right. Now, if you were to win, would you continue to represent him? Your Honors, we would think very seriously about that, indeed. We have, under this Court's pro bono program, assumed other representations of this sort, but it's something that I'm not in a position to speak to here today. But we would very seriously think about it. Thank you. If I may move on to the grievance process itself. Your Honors, this claim, too, was dismissed at the screening phase, dismissed for failure to state a claim on which relief may be granted. And we believe that that, too, is breathtaking in its implications, because Mr. Gronkwa specifically alleged that this grievance process, by its operation, was denying inmates the ability to come to courts and bring meritorious claims against prison officials for their misconduct. It did so in myriad respects. The prison process, on average, according to the complaint, takes some 6 to 18 months to be completed, if it can be completed. That many of these grievances were simply thrown out or destroyed to the extent that they stated meritorious claims against prison officials, that this was pervasive and continuing. It was part and parcel of how the grievance process operated. And, Your Honors, I do want to note for the Court that if you look at the supplemental excerpts of record on pages 81 and 92, you will see that at trial, indeed, the prison largely conceded these points. It agreed that at least for some period of time the grievance process had been operating in an untimely and unfair fashion, so much so that the person responsible for that grievance process was sanctioned. But even so, Mr. Gronkwa's complaints against the grievance process were dismissed, and the district court's rationale for dismissing it was simply that this Court had said in Mann that there's no constitutional entitlement in the first instance to a grievance process where none exists. And I want to be clear with the Court, we concede that. We absolutely concede that if there's no grievance process, there's no constitutional complaint to be stated. But if there's no grievance process, Your Honors, then an inmate who wishes to bring a meritorious claim in court is not obliged to go through the hurdles of that grievance process before exhaustion has occurred and the claim can be stated in court. The problem here, the grovement of the problem, is that the grievance process is creating a mountain, a futile, treacherous mountain that inmates must climb before they can ever come to Federal court. And here it's a very difficult one for inmates to climb, and we believe that more is required of a grievance process, given this Court's decision in Bradlee v. Hall that an improper grievance process will interfere with access to courts, given the consistent instruction of the Supreme Court in, for instance, New York Times v. Sullivan, that there cannot be content-based discrimination based upon that speech, which is critical of the government and its officials and points to their misconduct, very similar to what this Court held in the Shaker case that we also cite in our briefs, and finally, that this is an unconstitutional condition that's being imposed as part of the grievance process, namely that an inmate must surrender meritorious claims against prison officials in order to access this grievance process meaningfully. And this Court held, for instance, in the Vignolo case, that even if there's no preexisting constitutional entitlement to a particular benefit, such as prison employment, prison employment nonetheless can't be conditioned on surrendering of constitutional rights, and that's what we believe is happening here. And it's also something that the Supreme Court said in the Velazquez case was especially problematic to the extent that imposition of an unconstitutional condition could frustrate the natural operation of legal processes and the ability of courts to decide meritorious claims. Here, this grievance process is making it awfully, awfully difficult. For meritorious claims to be brought against prison officials that point to their misconduct, and we believe that that's an independent constitutional problem, one that infects the entire grievance process and defendants' operation of that grievance process. So here, too, Your Honors, we believe Mr. Gromquist should have been permitted to proceed. I don't quite – I don't quite appreciate the significance of this. If he – if he pursues what he visualizes as a meritorious claim, and he has all these obstacles, what is his complaint except time? There is certainly that, Judge Levy. There's time. There's the – Well, but he – he – no matter what the outcome of the grievance is, he gets his access sooner or later. Well, but perhaps later, Your Honor. And we believe that – So – but isn't it a matter to focus solely on delay rather than the process may be convoluted, if it's all right if it's convoluted, if it could be done in a short order? But, Judge Levy, I would submit that there's something troubling about the notion that a prison that operates a grievance process that simply serves purposes of delay, simply serves purposes of obstruction, without deciding meritorious claims in a fair way, as – and Mr. Gromquist has further alleged that this grievance process is being used as leverage to make arguments about exhaustion in Federal courts, if the only import of that is that an inmate at the end of that long obstructionist process can come to Federal court to the extent the inmate has the fortitude and the persistence to make it all the way to Federal court, the prison is no differently situated at that point than it would have been if it had just done the right thing in the first instance and either had a fair grievance process or no grievance process so that it's straight entry into the courts. That's – that's the extent of our submission, and we do believe that it's grounded, as I said, in this Court's precedents and in the Supreme Court's precedents, about why it is that you cannot have unconstitutional conditions even in prisons, why you cannot have viewpoint discrimination that's occurring in prison. Kennedy. But he theoretically could have a remedy on a case-by-case basis to say, I'm going to go ahead and file in Federal court, and I'm going to claim that I've exhausted this because they've subjected this specific claim to irrational delay. If an inmate can run that gauntlet, they can, in theory, at the end of the day, find themselves situated as they, we would say, ought to have been situated if it had just been candidly stated by the prison that we really don't have a grievance process that can help you here. But we also believe that the Court's decision in Bradley v. Hall is squarely on point here, Your Honors, because there it was a grievance process that did impose a barrier. The barrier was specifically that if there was harsh language, and I submit in that case it was quite harsh language, that the inmate had directed against a prison guard, and that led to sanctions or adverse treatment of the grievance by the prison. This Court said that that implicated access to courts, because the grievance process was being obstructed in a way that was unconstitutional, was at odds with letting inmates get their claims to court as stated by them. And we think that the same line of analysis holds here. And perhaps there's, you know, to be sure, there's room for factual discussion and legal debate upon this point. We simply believe that it should not have been dismissed at the threshold as it was here. Kagan. Kagan. But which claim was tried to the jury? The claim that was tried to a jury, Judge Schroeder, was a claim for retaliation based upon Mr. Gromquist's exercise of his First Amendment rights on his own behalf, that he was specifically being, with adverse intent, with a specific motivation on the part of prison officials to respond to this invocation of his First Amendment rights, and with the resulting chilling effect on his exercise. So there were distinct requirements for that retaliation theory that we believe would not apply to this theory. You're rapidly running out of time. Do you want to get to your lighting? Yes. Thank you, Judge Schroeder. I will. And so if we could reach the constant elimination claim, the Eighth Amendment claim here, the allegation in Mr. Gromquist's complaint can be found at Excerpts of Record, page 99, paragraph 4.122. Mr. Gromquist says that he, quote, And the district court dismissed that because it said that could not possibly amount to serious injury. The reason the district court offered here was that this Court's decision in the Keenan case that did find a possible Eighth Amendment problem involved six months of constant elimination, whereas the period here was only 30 days. Your Honor, that seems to us far too facile a rationale that it's not a question of the period of this. Clearly, this was weeks of constant elimination, according to Mr. Gromquist, with resulting serious injury. In the Allen case, for instance, this Court held that six weeks of deprivation of outdoor exercise could rise to the level of an Eighth Amendment problem. And this seems far harsher than that. And if Your Honors could posit, could imagine the case of, let's say, an inmate who's suffering epileptic seizures or migraine headaches in the face of constant elimination, surely that is cognizable under the Eighth Amendment. Here, the district court never got into the facts, never allowed factual development to see the full magnitude of the injuries that were being incurred. And finally, the district court dismissed because it said there was no showing of deliberate indifference. We believe that the complaint amply documents deliberate indifference, with Mr. Gromquist continually complaining to prison officials about the circumstances he was suffering, being denied medical care, being told that he had the only way to avoid this problem was not to be transferred back to the same unit. And finally, Your Honors, I'd simply point out that on the excerpts of record, page 101, Mr. Gromquist specifically says that defendant's motivation here was to subject him to this constant elimination, quote, for punishment, close quote, and says that they were the defendants were deliberately indifferent to his serious medical needs, and that this imposition of punishment was not rationally related to any penological interest. If that, Your Honors, fails to state a valid claim on which relief might be granted, then, frankly, we don't know how one might be pled. And with that, we simply reserve a small balance of our time for rebuttal. Thank you, Your Honors. May it please the Court, my name is Douglas Carr. I'm an assistant attorney general for the State of Washington and represent the prison officials in this case. Your Honor, the first issue I would like to address is plaintiff's request that this Court overturn the jury's verdict on plaintiff's retaliation and interference with attorney-client relationship claims. This is, frankly, a rather bizarre and ultimately meritless request, Your Honor, because they do not claim that there is a single error in the trial that occurred on these claims. They do not claim that there was any error in picking the jury, no error in counsel's arguments, no evidentiary errors, no errors in the trial court's rulings during the course of the trial, and no error in the jury's instructions. They also do not claim that the plaintiff was prevented from presenting any and all evidence that was even remotely relevant to his retaliation and interference with attorney-client claims. I guess what I would like you to help me with is, and I'm speaking just for me because my confusion is probably unique, but if he the claim that was tried to the jury was the claim that they had retaliated for his filing of what, for his, for filing of stuff on his own behalf? That's correct, Your Honor. The trial court's initial screening order and the pretrial order in the case made it very clear that he was allowed to try his claim, that he was retaliated against for exercising his own constitutional rights to file not only grievances, but also losses. But what is the difference between that and the claim argued now that he was retaliated for helping other people? Is that the claim that you understand is being argued here? They are asserting that there was a separate retaliation claim which was in fact dismissed by the district court in its initial screening order. And remember, this screening was done before the defendants were even served and involved in the case. Right. And what the Court said, based upon its reading of Shaw v. Murphy, was that he did not have a right to assist other inmates in litigation. Now, I think it's important to look at the record as to what he was actually asserting. And it was not that he was communicating with inmates. It was that he had the right to assist other inmates in litigation. So it was very ñ it was a very narrow and very specific claim that the Court was addressing. And the Court's resolution, ultimately, of that issue was consistent with the Supreme Court and this Court's decision in Storrset. Right. Well, now we have an army of people on the appeal. And they are arguing that the actual claim was not that he had some kind of special right to assist other people, which he does not, but that he has a First Amendment right to communicate with those people, and he was retaliated against for that. Well, they're saying that in their briefing, but that's not what Mr. Gronquist alleged in his complaint. He was very specific. He said that he ñ and, in fact, on this particular claim, there were only two defendants. And he says those defendants transferred him from one prison housing unit to another because, quote, he had assisted another inmate in litigation, not that he had communicated. We don't know exactly what ñ Well, they are making ñ but they are now ñ I mean, this is gone ñ this is going through our pro bono program, and they are making that claim now. What is your response to that claim, other than the fact that it wasn't in the original pro se complaint? Well, I mean, if it's not in his complaint, we certainly can't ñ we can't ñ Well, let's assume that you can interpret it that way. It was dismissed. You never got a chance to answer it, I assume. Suppose that we agree with them that that's the claim. What is the response to that? Should it have been dismissed, or do you have to ñ do we have to send it back for you to give some kind of reason? Understanding that the screening order in this case, Your Honor, gave Mr. Gronquist an opportunity to submit an amended complaint and invited him to do so. And he could have certainly bolstered that claim if he had wanted to. He did not. But I don't think there's any First Amendment right to communicate with other inmates, not just on assistance in legal matters, but where does this right stem from that he has a right to talk to other inmates about anything? So I would say that, no, that doesn't state a claim. And, again, we're dealing with something here that's not contained in their complaint. If I may go back to my argument concerning the request that this Court overturn the jury's verdict, Your Honor, a trial in which there is no claim of error is, by definition, a fair trial. And cannot be overturned on the ñ But you're ñ you're taking a mainline approach to this, whereas the argument that's made is that there was something wrong with the trial, no matter how it was conducted, simply because it didn't have, for lack of a better perspective, a shotgun effect by having a number of other claims along with it. That's the argument. That's correct, Your Honor. What ñ what ñ And it isn't ñ there's no complaint about the ñ the ñ any error made in the trial other than he just didn't get to bring three or four more claims along with it, no matter what their merits might be. That's it. That's correct, Your Honor. And they say that the plaintiff was prevented from presenting what they call a overarching, unified account of how WDOC ñ and I'm ñ I'm quoting directly from their brief at page 57 ñ how DOC routinely goes against the rules in suppressing challenges to officials' misconduct. Well, there are several problems with that argument. First, WDOC is not a defendant in this case and couldn't be under the Eleventh Amendment. I think a more important problem is that it assumes that all of these claims would necessarily go to trial and be tried with his ñ the claims that were actually tried. There's ñ that's pure speculation. Many of these claims, perhaps all of them, could be dismissed on summary judgment. So ultimately, at the end of the day, the Court could be sitting there with the exact same claims and we're going to retry those again based upon a record that contains no error? That ñ that doesn't make any sense, Your Honor. And also, the plaintiff tried his retaliation claim against 24 defendants, ranging from correctional officers to correctional sergeants, lieutenants, the prison warden, and even the secretary of the Washington Department of Corrections. If that's not an overarching, unified complaint of misconduct, I don't know what there is. What more do they need to add on that? And one has to understand that with all those defendants on this retaliation claim, he was not presented ñ prevented from presenting any and all evidence that he wanted to on this overarching, unified claim. Was he represented at the ñ Pardon? Was he represented at the trial? That's correct, Your Honor. He was represented by counsel. Now, it's ñ he also makes a claim that because he didn't have these other claims along with his retaliation claim that was tried, that somehow or other it put undue emphasis on his credibility. Well, that's really an interesting claim because that's not what Mr. Gronquist told this Court in his pro se brief. He indicated on page 39, approximately page 39, because he didn't paginate his pro se brief, he says if the Court had waited to hear the defendant's opening statements, it would have realized that Gronquist's credibility was not central at all as defendants admitted the acts in controversy but denied a malevolent attempt. So there's no basis to suggest that Mr. Gronquist's credibility would have been more or less of an issue if these other claims had been included. And ultimately ñ Well, I take it that his ñ that he was able to argue, saying he was able to argue that what I was doing was not only helping my own ñ putting in my own claims, but I was helping other prisoners and doing ñ being a good deed in a Boy Scout? Well, that's certainly one of the claims that he's alleging was inappropriately dismissed. Was he permitted to argue that before the jury? Well, to the extent it ñ it involved his own rights, then, yes, he was fully allowed to present argument on that and evidence. Now, a plaintiff made an attempt to show how his dismissed claims were relevant to the claims that were actually tried. And the claim that's clearly the closest is his claim of retaliation for assisting other inmates. Again, there's no ñ there's no reason to think that because he wasn't allowed to bring that claim ñ and, again, that claim was only against two defendants. That's somehow or other prejudiced his retaliation claim against the 24 people that he actually took to trial. And then the ñ on the other end of the spectrum, we have his constant illumination claim, which has nothing whatsoever to do with his retaliation claim, or his assertion that he was unable to present this overarching, unified account of ñ of basically retaliation. Plaintiff has not cited a single case in which a court has conducted a trial on a claim. There's no claim of error in that trial. And that trial should somehow or other be set aside because the court may have erroneously dismissed other separate claims. There's not a single case that supports that. Now, the case they do cite out of the First ñ First Circuit from 1980, that is a case that was a 12b6 motion, where the court said you should consider some of these things together to determine retaliation. I'm not sure what the other claim was. But that certainly wasn't overturning a jury's verdict where there, again, no claim of error. Now, the ñ the next issue I would like to address is plaintiff's claim that the interference with attorney-client relationship claim should be sent back to the district court. Now, plaintiff asserts at their ñ in their reply brief at page 18, and I'm going to quote this because I think it's important, that the ñ this claim was dismissed at the outset. There is ñ this is a misstatement of fact. It's certainly a mischaracterization of the record here, Your Honor. And all we need to do is look at the plaintiff's excerpts of record. We look at the screening order, which is on page 9 of plaintiff's excerpts of record ñ record. And it says, to the extent plaintiff asserts claims of retaliation and interference with his attorney-client relationship, the court will allow him to proceed. And then we go to the joint pretrial order in this case, and that is the appellant's excerpts of record 55 through 65. And on page 56, plaintiff's contentions. And it says, plaintiff Gronquist asserts that defendants wrongfully interfered with his attorney-client relationship. This is plaintiff's contention at trial. The next page on ER 57, defendants contend that they have not wrongfully interfered with plaintiff's attorney-client relationship. And then in the issues of fact, again, on ER 57, whether defendants or any of them wrongfully interfered with plaintiff's attorney-client relationship. And finally, on excerpts of record 64, it reiterates the court's original ruling in the screening order that he was allowed to proceed with his interference with attorney-client relationship claim. So there's absolutely nothing in the record to suggest that this was dismissed early on. It wasn't ever dismissed at all. Now, the plaintiffs are correct that there were no jury instructions on that particular claim. Why is that? Did the judge disallow them? Did he throw them out? Did he strike them? No. There were no jury instructions because Mr. Gronquist did not submit any. And it certainly wasn't the court's responsibility to submit jury instructions on this claim, which was clearly allowed by the court in the screening order, clearly allowed in the pretrial order. It wasn't the judge's obligation to do that. If there were not jury instructions, and there weren't, it was because Mr. Gronquist didn't propose any. And by not proposing those, he's clearly waived that. He cannot premise error on his own failure to submit jury instructions on a claim that the court allowed him to proceed with. So the court allowed him to proceed with. Kagan. But his complaint appears to be one. Could you just help me on one more thing? I understand what you're saying. But his complaint was filed pro se? That's correct, Your Honor. At what point did he get counsel? Well, certainly well before trial, months before trial. And frankly, there wasn't a lot that occurred in the case between the initial screening and the trial. There was not a summary judgment motion. There was not a lot of discovery. Was counsel appointed for him, or did he get what he wanted? No. He was retained counsel, Your Honor. He was retained by Mr. Gronquist. And it went to trial on the original pleading, I take it. There was no amendment of the pleading or paring down or repleading of anything? That's correct. That's correct, Your Honor. And again, both the screening order and the pretrial order made very clear what claims he was allowed to proceed with at trial, and he just didn't proceed with his interference claim. Now, I would note that the record demonstrates on that particular claim, which was that Mr. Gronquist had reviewed some legal documents that Mr. Gronquist was sending to Mr. Hamilton, who was his trial counsel, but of course, this was well before the case and well before he was attorney in the case, that that officer reviewed those and said something to the effect that I don't like you suing my folks and I'm not going to let you send this out, and that's what he says in his complaint. He wouldn't let me send this out. That's the interference with attorney-client relationship. But at trial, he admitted and testified that, in fact, he was allowed to send it out a day later or two days later. So there was really no substance there, and I suspect that that is the reason why he didn't proceed with that particular claim at trial, because it had no factual basis. He could show no injury resulting from that, because while even if you assume that the officer did not allow him to send it out, he sent it out several days later, and he never claimed any prejudice from that. So the idea that this attorney-client relationship claim should somehow or other be resurrected when it was basically abandoned by Mr. Gronquist, I — there's just no basis for that. Well, if it's a freestanding claim that hasn't been adjudicated. It was adjudicated, Your Honor. He was allowed to bring that to trial. I know he was allowed, but where's the judgment resolving it? Well, there was a judgment in favor of the defendants. No, but on what claim? On all claims that he was able to bring to trial. Is that the way it reads? Well, that's not what that — I think — I haven't looked at the judgment, Your Honor, but I think it's that all his claims that went to trial — You're not suggesting we have a jurisdictional problem here in that we do not have a resolution of all claims, or are you? No, because the pretrial order says that the plaintiff may proceed on his claims of retaliation and interference with his attorney-client relationship, providing — and then the claims of providing legal assistance to other inmates, interference with the state court litigation and grievance procedures, access to courts, grievance process, and constant illumination are dismissed. Is there anything else left? I guess I'm not understanding your question, Your Honor. The pretrial order lists retaliation and interference with the attorney-client relationship, may proceed, and then it lists a whole bunch of other claims that are dismissed. Does that take care of everything? I think so, Your Honor. Yes, that listed all the claims that he had raised, the two that were allowed to proceed to trial and those that were dismissed in the screening order. And that was in the joint pretrial order. May I briefly address the plaintiff's claim about his constitutional right to assist other inmates in litigation? The Supreme Court in the Johnson v. Avery case has cited in our brief held that inmates do not have a constitutional right to provide legal advice and legal assistance to other inmates. And this Court reiterated that in the Storseth case, Storseth v. Spellman, which is cited in our brief, in which — and I think it bears quoting what this Court said. Access to inmate assistance does not mean that Storseth has a right to inmate assistance in general or to Riddell's assistance in particular. Having provided adequate alternatives, the State is free to bar this assistance, free to bar. To me, unless I'm out in left field, that means that there is no constitutional right to assist other inmates in litigation. I don't think it could be more clear. Storseth, to my knowledge, has not been overruled. It's still good law. And nothing in Shaw v. Murphy, although I will concede I'm a little — that's a difficult case to read because of the language in it. It doesn't suggest that there is a constitutional right to assist inmates in litigation. It does not say that. So at the very least, I think we're looking at something here that the defendants would be entitled to qualified immunity. In light of this Court's holding in Storseth that there's — the State can bar this altogether. The State could not bar it if it was constitutionally required. And unless I'm misreading that, I think that's dispositive of this particular claim. Now, the — I'm going to briefly address the right to a grievance process. We have the Mann v. Adams case where the court — this Court said no right to a grievance process and it's not of constitutional magnitude. And then we have the Bradley case where this Court said if you utilize that, it may be of some constitutional magnitude. But I think properly understood, the Bradley case is not a case about the grievance mechanism. It's a case about a person's right to petition the government for redress of grievances. I think Bradley would have been decided exactly the same way if the inmate had simply written a letter to the superintendent or to the governor and said the exact same thing he said, that this correctional officer was out of line, et cetera. And the premise there was not the grievance. It was the fact that he was petitioning the government for redress of grievances. And that's — that the application of Bradley to this case is exactly what occurred at the trial. He is claiming that I used the grievance process and they punished me, and that's retaliation. So I think properly understood, the Bradley case is a retaliation case. I exercised my right. You punished me in Bradley. It was a prison infraction for using disrespectful language here. It was a number of other things, he alleged. But that was — that was an issue that he brought to trial. He lost on that issue. He should not be able to bring that up again. Bradley, I don't think, can be — may I proceed a little farther, Your Honor? Yes. Bradley cannot be understood as giving some due process rights or even an access to courts case, because it was not. Access to courts and due process was not at issue in the Bradley case. It was — it was essentially a retaliation case, which is exactly what — Thank you. So, Your Honor, we would ask that the Court affirm the judgment of the district court in this matter. Thank you, Your Honor. Thank you. We'll give you a minute and a half. We allowed your adversary to go over. Thank you, Your Honors. Very quickly, just to clarify a few points. We're very proud of what the Army from Stanford has accomplished, but we need to give  We believe Mr. Gronquist's complaint at the outset. It did allege the very same claim that was at issue in Chauvie-Murphy, legal assistance to other inmates involving communication, and the Supreme Court's disposition, although Mr. Carr describes it as difficult to read, we think the decision could not be clearer, that there was a remand there for application of the standard Turner factors, the classic analysis of whether there's justification, legitimate, penological justification for impinging upon the First Amendment right. And that's exactly what this Court said Chauvie-Murphy stood for in the Hargis case. So we think that precedent is very clear, and the precedent that Mr. Carr was citing predates that and stands for the proposition that you have to allow inmates to provide legal assistance to one another if there isn't other meaningful access to the courts being afforded through libraries. I guess I'm not quite understanding how you were precluded from arguing that. Well, the we think that the district court's dismissal order is very clear on this point, Judge Schroeder, and if I can point, Your Honor, to it, it's in the excerpts of record that you have, page 14 and 15, where these claims and the relevant allegations were dismissed with prejudice. So although Mr. Carr said that there was leave to amend, there was not leave to amend on this point. The district court treated these theories as categorically foreclosed by Chauvie-Murphy, which is why we think it was such a stark and clear misreading and one that requires reversal. But the dismissal order is pellucid on that point. And, Judge Schroeder, you were expressing some confusion about how to delineate this claim from the one that went to the jury, and we appreciate that confusion and we share it. And that is, in fact, what grounds our argument for a new trial here, because there was such a close and inextricable relationship between these theories. To cut one off, even as the other went to a jury, did involve some prejudice,  the fact that there was such a close working relationship between these two claims. One of them was foreclosed and clearly foreclosed by the dismissal order. So Mr. Gronkowicz couldn't make the argument that there was, in fact, retaliation against him for exercising an underlying right. I appreciate your argument, and we'll have to take it into consideration with the record, including the trial order and everything else. We gladly leave it to the Court's discretion. Thank you very much. Thank you. The case just argued is submitted for decision. The Court appreciates the quality of argument presented on both sides. Thank you, Your Honor.
judges: Schroeder, Leavy, Fairbank